# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **LYNN MELUGIN,** | § | |
| | § | |
| **Plaintiff,** | § | |
| **v.** | § | **CIVIL ACTION NO.** |
| | § | |
| **MICHAEL J. ASTRUE,** | § | **SA-09-CV-0120 XR (NN)** |
| **Commissioner of the Social** | § | |
| **Security Administration,** | § | |
| | § | |
| **Defendant.** | § | |

## REPORT AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE

**TO:** **Honorable Xavier Rodriguez**
**United States District Judge**

### <u>Introduction</u>

Plaintiff Lynn Melugin brought this action for judicial review of the final decision of the Commissioner of the Social Security Administration (the Commissioner), determining that Melugin is not disabled for the purposes of the Social Security Act (the Act) and denying Melugin's application for Supplemental Security Insurance (SSI). Melugin asks the district court to reverse the Commissioner's decision and to render judgment in his favor. In the alternative, Melugin asks the district court to reverse the decision and remand the case for further proceedings.

After considering Melugin's brief in support of his complaint,[1] the brief in support of the

---

[1]Docket entry # 14.

Commissioner's decision,[2] Melugin's reply brief,[3] the record of the SSA proceedings, the pleadings on file, the applicable case authority and relevant statutory and regulatory provisions, and the entire record in this matter, I recommend affirming the Commissioner's decision.

I have jurisdiction to enter this report and recommendation under 28 U.S.C. § 636(b) and this district's general order, dated July 17, 1981, referring for disposition by recommendation all cases where a plaintiff seeks review of the Commissioner's denial of the plaintiff's application for benefits.[4]

## Jurisdiction

The district court has jurisdiction to review the Commissioner's final decision as provided by 42 U.S.C. §§ 405(g), 1383(c)(3).

## Administrative Proceedings

Based on the record in this case, Melugin exhausted his administrative remedies prior to filing this action in federal court. Melugin applied for SSI on December 13, 2005, alleging disability beginning on December 1, 2005.[5] Melugin contends he became disabled because of depression and anxiety on December 1, 2005.[6] At that time, Melugin was living on the streets. On December 6, 2005, Melugin went to the University Hospital, complaining about depression

---

[2]Docket entry # 15.

[3]Docket entry # 17.

[4]*See* Local Rules for the Western District of Texas, appx. C, p. 10.

[5]The record does not contain Melugin's application, but the ALJ referred to the application date in the ALJ's opinion. SSA record, p. 9 (stating that the claimant applied for SSI on Dec. 13, 2005).

[6]*Id*. at pp. 133 & 140.

and anxiety and stating that he was worried he might hurt himself.[7]  Melugin was voluntarily

admitted to the hospital for a brief stay and released on December 9, 2005, with an appointment

at Brady Green[8] for follow-up treatment.[9]  The record does not reflect that Melugin went to

Brady Green on the scheduled date; instead, the record reflects he applied for SSI on that date.

The Commissioner denied the application initially and on reconsideration.[10]  Melugin then asked

for a hearing before an ALJ.[11]  An ALJ held a hearing on January 10, 2008.[12]  The ALJ issued a

decision on April 8, 2008, concluding that Melugin is not disabled within the meaning of the

Act.[13]  Melugin asked the Appeals Council to review the decision.[14]  On December 24, 2008, the

Appeals Council declined to review the case, determining no reason existed for reviewing the

decision.[15]  The ALJ's decision became the final decision of the Commissioner for the purpose of

the district court's review pursuant to 42 U.S.C. § 405(g).  Melugin filed this action seeking

review of the Commissioner's decision on February 25, 2009, after obtaining leave to proceed in

---

[7]SSA record, p. 160.

[8]"Brady Green" is part of the University Health System.  Brady Green is the site of San Antonio's first public hospital.  San Antonians who do not have health insurance can obtain medical care at Brady Green.

[9]SSA record, p. 249.

[10]*Id*. at pp. 55-56.

[11]*Id*. at p. 66.

[12]*Id*. at p. 16.

[13]*Id*. at p. 6.

[14]*Id*. at p. 86.

[15]*Id*. at p. 1.

forma pauperis.[16]

**Issue Presented**

Is the ALJ's decision that Melugin is not under a "disability," as defined by the Act, supported by substantial evidence and does the decision comport with relevant legal standards?

**Analysis**

**A. Standard of Review**

In reviewing the Commissioner's decision denying disability benefits, the reviewing court is limited to determining whether substantial evidence supports the decision and whether the Commissioner applied the proper legal standards in evaluating the evidence.[17] "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[18] Substantial evidence "must do more than create a suspicion of the existence of the fact to be established, but 'no substantial evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'"[19]

If the Commissioner's findings are supported by substantial evidence, then they are conclusive and must be affirmed.[20] In reviewing the Commissioner's findings, a court must

---

[16]Docket entry # 3.

[17]*Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995); 42 U.S.C. §§ 405(g), 1383(c)(3).

[18]*Villa v. Sullivan*, 895 F.2d 1019, 1021-22 (5th Cir. 1990) (quoting *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983)).

[19]*Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988) (quoting *Hames*, 707 F.2d at 164).

[20]*Martinez*, 64 F.3d at 173.

carefully examine the entire record, but refrain from reweighing the evidence or substituting its judgment for that of the Commissioner.[21]  Conflicts in the evidence and credibility assessments are for the Commissioner and not for the courts to resolve.[22]  Four elements of proof are weighed by the courts in determining if substantial evidence supports the Commissioner's determination: (1) objective medical facts, (2) diagnoses and opinions of treating and examining physicians, (3) the claimant's subjective evidence of pain and disability, and (4) the claimant's age, education and work experience.[23]

### 1. Entitlement to Benefits

Every individual who meets certain income and resource requirements, has filed an application for benefits, and is under a disability, is eligible to receive benefits.[24]  The term "disabled" or "disability" means the inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."[25]  A claimant shall be determined to be disabled only if his physical or mental impairment or impairments are so severe that he is unable to not only do his previous work, but cannot, considering his age, education, and work experience, participate in any other

---

[21]*Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995); *see also Villa*, 895 F.2d at 1021 (The court is not to reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of the Commissioner.).

[22]*Martinez*, 64 F.3d at 174.

[23]*Id.*

[24]42 U.S.C. § 1382(a)(1) & (2).

[25]42 U.S.C. § 1382c(a)(3)(A).

kind of substantial gainful work which exists in significant numbers in the national economy, regardless of whether such work exists in the area in which the claimant lives, whether a specific job vacancy exists, or whether the claimant would be hired if he applied for work.[26]

## 2. Evaluation Process and Burden of Proof

The Commissioner's regulations provide that disability claims are to be evaluated according to a five-step process.[27]  A finding that a claimant is disabled or not disabled at any point in the process is conclusive and terminates the Commissioner's analysis.[28]

The first step involves determining whether the claimant is currently engaged in substantial gainful activity.[29]  If so, the claimant will be found not disabled regardless of his medical condition or his age, education, or work experience.[30]  The second step involves determining whether the claimant's impairment is severe.[31]  If it is not severe, the claimant is deemed not disabled.[32]  In the third step, the Commissioner compares the severe impairment with those on a list of specific impairments.[33]  If it meets or equals a listed impairment, the claimant is

---

[26]42 U.S.C. § 1382c(a)(3)(B).

[27]20 C.F.R. §§ 404.1520 and 416.920.

[28]*Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995).

[29]20 C.F.R. §§ 404.1520 and 416.920.

[30]*Id.*

[31]*Id.*

[32]*Id.*

[33]*Id.*

deemed disabled without considering his age, education, or work experience.[34]  If the impairment is not on the list, the Commissioner, in the fourth step, reviews the claimant's residual functional capacity and the demands of his past work.[35]  If the claimant is still able to do his past work, the claimant is not disabled.[36]  If the claimant cannot perform his past work, the Commissioner moves to the fifth and final step of evaluating the claimant's ability, given his residual capacities, age, education, and work experience, to do other work.[37]  If the claimant cannot do other work, he will be found disabled.  The claimant bears the burden of proof at the first four steps of the sequential analysis.[38]  Once the claimant has shown that he is unable to perform his previous work, the burden shifts to the Commissioner to show that there is other substantial gainful employment available that the claimant is not only physically able to perform, but also, taking into account his exertional and nonexertional limitations, able to maintain for a significant period of time.[39]  If the Commissioner adequately points to potential alternative employment, the burden shifts back to the claimant to prove that he is unable to perform the alternative work.[40]

## B.  Findings and Conclusions of the ALJ

In the instant case, the ALJ reached his decision at step four.  At step one, the ALJ

---

[34]*Id.*

[35]*Id.*

[36]*Id.*

[37]*Id.*

[38]*Leggett*, 67 F.3d at 564.

[39]*Watson  v. Barnhart*, 288 F.3d 212, 217 (5th Cir. 2002).

[40]*Anderson v. Sullivan*, 887 F.2d 630, 632-33 (5th Cir. 1989).

determined that Melugin had not engaged in substantial gainful activity since his alleged onset date.[41]  At step two, the ALJ determined that Melugin has the following severe impairments: major depressive disorder, panic disorder, marijuana abuse and asthma.[42]  At step three, the ALJ determined that Melugin does not have an impairment or combination of impairments that meets or medically equals an impairment listed in 20 C.F.R., Part 404, Subpart P, Appendix 1.[43]  At step four, the ALJ determined that Melugin has the residual functional capacity to perform his past relevant work as a service station attendant and a maintenance mechanic.[44]  Because Melugin can perform his past relevant work, the ALJ concluded that Melugin is not disabled under the Act.[45]

## C.  Melugin's Allegation of Error

Melugin does not complain about the ALJ's consideration of his physical impairment—he complains only about the ALJ's assessment of his mental impairment.  Melugin first complains that the ALJ failed to apply the proper legal standard in considering his mental impairment.  The Commissioner's regulations require a two-step process for evaluating mental impairments.  The ALJ must first evaluate the claimant's pertinent symptoms, signs, and laboratory findings to determine whether the claimant has a medically determinable mental

---

[41]SSA record, p. 10.

[42]*Id.*

[43]*Id.* at p. 10.

[44]*Id.* at p. 14.

[45]*Id.* at p. 15.

impairment.[46]  If the ALJ determines the claimant has a medically determinable mental

impairment, the ALJ must specify the symptoms, signs, and laboratory findings that substantiate

the presence of the impairment and document the ALJ's finding.[47]  The following passage from

the ALJ's opinion shows that the ALJ accomplished the first step of the process:

> The claimant alleges disability due to mental illness but the record reflects that the
> claimant's symptoms are amendable to control with medication therapy provided
> that the claimant complies with treatment and abstains from substance abuse.  The
> record reflects that the claimant was voluntarily hospitalized for three days in
> early December 2005 with diagnoses of major depressive disorder, marijuana
> abuse, and dysthymia after reporting depression and panic attacks. . . . He was not
> taking any prescribed medications at that time but it was noted that his urine
> specimen was positive for marijuana use even though he denied recent use. . . . He
> was placed on proper medications for his diagnoses and his symptoms quickly
> improved. . . . Subsequent treatment records document that his symptoms are
> effectively controlled with medication therapy.  For example, treatment records
> from [t]he Center for Health Care Services (CHCS) dated December 16, 2005
> show the claimant was assessed with a major depressive disorder and that, on
> medication, his Global Assessment of Functioning (GAF) was 55.  According to
> the Diagnostic and Statistical Manual of Mental Disorders – Fourth Edition
> (DSM-IV), a GAF of 55 indicates the claimant was experiencing moderate
> symptoms or had moderate difficultly in social, occupational, or school
> functioning.[48]

After specifying the symptoms, signs, and laboratory findings substantiating the presence

of a mental impairment, the ALJ must rate and record the degree of functional limitation

resulting from the impairment based on four areas: activities of daily living; social functioning;

concentration, persistence, or pace; and episodes of decompensation.[49]  The following passage

---

[46]20 C.F.R. § 404.1520a(b).

[47]20 C.F.R. § 416.920a(b)(1).

[48]SSA record, p. 12.

[49]20 C.F.R. § 416.920a(c).

from the ALJ's opinion shows that the ALJ accomplished this step:

> [Activities of daily living]  The claimant acknowledges that he is able to perform all of his self-care activities without assistance and that he does household chores including washing dishes, laundry, sweeping, mopping, and preparing simple foods.  [Social functioning]  The record as a whole does not document his alleged difficulties with people.  He continues to reside with his ex-wife and children.  He reports maintaining social contacts and attending church services on a routine basis. . . .  [Concentration, persistence, or pace]  An April 20, 2006 mental status examination showed he was able to spell "horse" forward and backward correctly, that his digit span was 6 forward and 5 backward and that he had no difficulty doing single digit subtraction.  His recall was 3/3 after 5 minutes. . . .Mental health treatment records show his memory is intact on examination.  [Episodes of decompensation]  There is no evidence he has experienced an episode of decompensation of extended duration during the time at issue.[50]

Because the ALJ applied the proper standard, the question remaining is whether substantial evidence supports the ALJ's findings.

Activities of daily living.  "*Activities of daily living* include adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for [personal] grooming and hygiene, using telephones and directories, and using a post office."[51]  Melugin has no permanent home, instead he "bounc[es] around"[52] between the homes of various relatives and his ex-wife.  Although in a daily activity report Melugin alleged depression and anxiety limit what he is able to do,[53] he testified that he helps out with household chores in the various homes in which he lives by washing the dishes, doing his

---

[50]SSA record, pp. 10-11.

[51]20 C.F.R. pt. 404, subpt. B, app. I,§ 12.00C1.

[52]SSA record, p. 23.

[53]*Id*. at p. 133.

laundry, and sweeping and mopping the kitchen.[54]  He stated that he cooks simple foods, but that he usually give his food stamps to the people he stays with so they can purchase groceries and prepare meals.[55]  He also testified that he rides the bus.[56]  Dr. Charles McDonald—a non-examining psychologist—opined that Melugin was moderately restricted in activities of daily living.[57]  This evidence constitutes substantial evidence supporting the ALJ's finding that Melugin is able to perform all of his self-care activities without assistance and that Melugin does household chores including washing dishes, laundry, sweeping, mopping, and preparing simple foods.

Social functioning.  "Social functioning refers to the claimant's capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals.  Social functioning includes the ability to get along with others, such as family members, friends, neighbors, grocery clerks, landlords, or bus drivers."[58]  When Melugin was homeless he stated that he visited friends and family on an average day.[59]  During his hearing, he testified that he lived with his ex-step-father, his son and his ex-wife.[60]  After the hearing, Melugin reported to a licensed psychological associate that he lived with his ex-wife, his ex-step-daughter, the ex-step

---

[54]*Id*. at p. 30.

[55]*Id*.

[56]*Id*. at p. 22.

[57]*Id*. at p. 186.

[58]20 C.F.R. pt. 404, subpt. B, app. I,§ 12.00C2.

[59]SSA record, p. 134.

[60]*Id*. at p. 23.

daughter's three children, his ex-wife's boyfriend, and his son. He stated that he liked living there because his son and ex-wife were there, he gets along well with his ex-wife's boyfriend, and the children call him "grandpa."[61] Dr. McDonald opined that Melugin was mildly restricted in maintaining social functioning.[62] This evidence constitutes substantial evidence supporting the ALJ's finding that the record does not document Melugin's alleged difficulties with people.

Concentration, persistence, or pace. "Concentration, persistence or pace refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings."[63] Melugin testified that he cannot work because he is absent minded and sometimes spaces out,[64] but the record does not support that allegation. On April 20, 2006, Dr. Lewis Richmond—a state examining doctor—determined that Melugin's concentration was overtly adequate during his evaluation of Melugin, but found that Melugin's persistence and pace were impaired by Melugin's emotional and physical disorders.[65] On February 14, 2007, Melugin's treating physician found Melugin's memory was intact and assessed Melugin's overall functioning as 7-8 on a scale of 0 to 10 with 10 representing high functioning, noting compliance with prescribed medications.[66] On May 11, 2007, the same physician assessed Melugin's overall functioning as 4, noting that Melugin had

---

[61]*Id*. at p. 399.

[62]*Id*. at p. 186.

[63]20 C.F.R. pt. 404, subpt. B, app. I,§ 12.00C3.

[64]SSA record, p. 37.

[65]*Id*. at p. 12.

[66]*Id*. at pp. 371-74.

been out of medication for four days.[67] Dr. McDonald opined that Melugin had moderate difficulty in maintaining concentration, persistence and pace.[68] This evidence constitutes substantial evidence supporting the ALJ's findings about Melugin's concentration, persistence and pace.

Episodes of decompensation. The Commissioner's regulations provide the following about episodes of decompensation:

> *Episodes of decompensation* are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace. Episodes of decompensation may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two).[69]

Melugin was hospitalized from December 6 to December 9, 2005 for depression. The record contains no indication that he has not been hospitalized since that time. Since the three-day hospitalization, Melugin has received medication therapy from the Center for Health Care Services. This evidence constitutes substantial evidence supporting the ALJ's finding that no evidence shows Melugin has experienced an episode of decompensation of extended duration.[70]

Melugin complains that the ALJ ignored an opinion by Dr. Mark McGrath stating that Melugin is permanently disabled. Dr. McGrath is a psychiatrist who treats Melugin at the Center

---

[67]*Id*. at pp. 338-41.

[68]*Id*. at p. 186.

[69]20 C.F.R. pt. 404, subpt. B, app. I,§ 12.00C4.

[70]The regulations define "extended duration" as "lasting at least 2 weeks." 20 C.F.R. pt. 404, subpt. P, app. I, § 12.00C4.

for Health Care Services. On a form required by Texas's Department of Human Services for receipt of food stamps, Dr. McGrath indicated that Melugin is disabled due to depression.[71] Although Melugin submitted the form to the ALJ before the unfavorable opinion was issued,[72] the ALJ wrote, "No treating physician has specifically opined that the claimant is disabled from all work activity and the absence of such an opinion, in light of the claimant's allegations, is significant."[73] This mis-statement may be a result of timing, but timing may not be the reason because Melugin also submitted a psychological report after the hearing[74] and the ALJ specifically rejected the post-hearing report.[75] Regardless of why the ALJ mis-spoke, the district court must give the Commissioner's decision great deference unless the district court cannot find substantial evidence in the record to support the Commissioner's decision or finds that the Commissioner made an error of law.[76] Because a mis-statement is not an error of law, the relevant consideration is whether substantial evidence supports the Commissioner's decision.

The district court must consider the submission of new evidence to make this determination. After the ALJ issued the unfavorable decision, Melugin submitted two additional

---

[71]SSA record, p. 395.

[72]*Id*. at p. 383 (indicating that the form was received on Feb. 5, 2008); *id*. at p. 15 (indicating the ALJ issued an unfavorable decision on Apr. 8, 2008).

[73]*Id*. at p. 14.

[74]*Id*. at p. 396 (indicating that the post-hearing psychological report was received on Mar. 25, 2008—two weeks before the ALJ issued the decision).

[75]*Id*. at p. 14.

[76]*See Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995).

forms signed by Dr. McGrath indicating Melugin is disabled.[77]  Thus at the time the Appeals

Council denied Melugin's request for review, the record contained three forms from Dr. McGrath

stating that Melugin is disabled.[78]  "When new evidence becomes available after the

[Commissioner's] decision and there is a reasonable probability that the new evidence would

change the outcome of the decision, a remand is appropriate so that this new evidence can be

considered.  To justify a remand, 42 U.S.C. § 405(g) requires that the evidence is "new" and

"material" as well as a showing of "good cause" for failing to provide this evidence at the

original proceedings."[79]  The timing aspect of "materiality" requires new evidence to relate to the

time period for which benefits were denied[80]—here, December 1, 2005 (the alleged on-set date)

to April 8, 2008 (the date of the ALJ's decision).  The second and third forms fall beyond the

time period for which benefits were denied, and thus do not meet the materiality requirement.

The first form meets the materiality requirement because it was submitted before the ALJ issued

a decision, but it presents no reasonable probability of changing the outcome of the

Commissioner's decision because the opinion is not supported by Dr. McGrath's treatment

notes.[81]

The following passages from the ALJ's decision reflects a careful consideration of Dr.

---

[77]SSA record, pp. 403-07.

[78]The Appeals Council's order confirms that the Commissioner had the three forms when it denied review.  *Id*. at p. 4.

[79]*Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995).

[80]*See Latham v. Shalala*, 36 F.3d 482, 483 (5th Cir. 1994).

[81]The good cause standard is satisfied because Dr. McGrath signed the form after the hearing and Melugin submitted the form before the ALJ issued the unfavorable decision.

McGrath's treatment notes and the ALJ's determination that the treatment records were are odds with a finding of disabling effect.

> Subsequent treatment records [subsequent to the December 2005 hospitalization] document that his symptoms are effectively controlled with medication therapy. For example, treatment records from the Center for Health Care Services (CHCS) dated December 16, 2005 show the claimant was assessed with major depressive disorder and that, on medication, his Global Assessment of Functioning (GAF) was 55. According to the <u>Diagnostic and Statistical Manual of Mental Disorders</u> – Fourth Edition (<u>DSM</u>-IV), a GAF of 55 indicates the claimant was experiencing or had moderate difficulty in social, occupational, or school functions.

> * * *

> I give very little weight to [Dr. Lewis Richmond's] GAF [score] as it is inconsistent with the findings and opinions contained in Dr. Richmond's examination report, the findings and opinions contained in the claimant's CHCS treatment records, and the claimant's testimony regarding his daily activities, all of which suggest he experiences, overall no more than moderate symptoms and limitations due to any mental impairment.

> I note, for example, that CHCS treatment notes dated May 11, 2007 show the claimant was assessed with less than moderate symptoms in all areas (all of his symptoms were assessed as less than 5 on a 0-10 with several being "0" and the remainder being "1" or "2"). He was characterized as exhibiting a partial response to medication therapy and he reported only mild ("2" on a 0-10 scale with 10 being high) side effects to treatment. (Ex. 17F46). Consistent with this assessment, an examination showed that he was depressed and irritable but that his sensorium remained clear, his memory was intact, that his intellectual functioning was average, and that his speech and thoughts were coherent. Suicidal and homicidal ideation and hallucinations were not present. (Ex. 17F48). The claimant continued to experience generally mild (less than moderate) symptoms at the time of a January 24, 2007 CHCS appointment but he was noted to be experiencing "moderate" (5/10) depression. (Ex. 17F72). Even so, his mental status findings remained largely unchanged. (Ex. 17F74). However, his medications were changed (Ex. 17F73) with improvement in his depression and other symptoms as well as his overall functioning noted at the time of a February 14, 2007 follow-up appointment. (Ex. 17F76). The claimant's mental status examination had returned to baseline by that time. (Ex. 17F78 v. 17F48). By the time of a March 14, 2007 CHCS appointment, the claimant was assessed as exhibiting a full medication response. He was assessed with only some very mild ("1" on the 1-10 scale) symptoms and his overall functioning was 7-8 on a 0-10 scale with 10 representing high functioning. He continued to be assessed with

only mild side effects to treatment (2/10).  (Ex. 17F82).

> Given this evidence, I conclude that the claimant's major depressive disorder and panic disorder are largely controlled with treatment and do not preclude him from sustaining work within the above parameters [the ALJ's assessment of Melugin's residual functional capacity].  The record does not support the extent of the claimant's statements regarding the side effects from his medications.  CHCS treatment notes reveal that he has only experienced mild side effects to his medication therapy.  (Ex. 17F).[82]

These passages reflect no reasonable probability that the new evidence—Dr. McGrath's opinion as reflected on the Department of Health Services form—would change the outcome of the decision because the medical evidence supports a contrary conclusion than the one reflected on the form.  The ALJ may reject a treating physician's opinion when the evidence supports a contrary conclusion.[83]  The quoted passages, and my review of the record, show that Dr. McGrath's treatment notes do not support the opinion reflected on the Department of Health Services form.  The form indicates Melugin is precluded from working.  The treatment notes do not indicate Melugin is precluded from working.  Instead, the treatment notes indicate that Melugin's depression is controlled by medication therapy.  The treatment notes constitute substantial evidence supporting the Commissioner's conclusion that Melugin is not disabled under the Act.

Melugin also complains that the ALJ erred by rejecting the GAF score assessed by Dr. Richmond, a state agency psychiatrist.  The ALJ may give weight to the opinions of a state

---

[82]SSA record, pp. 12-13.  The parenthetical exhibits refer to Dr. McGrath's treatment notes.

[83]*See Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000).  The ALJ may assign little or no weight to a treating physician's opinion when the opinion is conclusory, unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence. *Newton*, 209 F.3d at 456.

agency psychiatrist insofar as the opinion is supported by evidence in the case record.[84]  An ALJ

is not bound by findings made by state agency psychiatrist, but the ALJ may not ignore a state

agency psychiatrist's opinion and must explain the weight given to the opinion in the ALJ's

decision.[85]  The following passage shows the ALJ complied with this requirement:

> Although the claimant complained of continuing symptoms during an April 20,
> 2006 examination by Lewis Richmond, M.D., his mental status examination
> confirmed the positive effects of treatment.  His affect was of mild anxiety and his
> mood was depressed but he was oriented to person, place, and time.  He could
> spell "horse" forward and backward correctly.  His digit span was 6 forward and 5
> backward.  The claimant had no difficulty doing single digit subtraction.  His
> recall was 3/3 after 5 minutes.  He was capable of interpreting proverbs.  The
> claimant reported living on the street or in a shelter.  However, he said he kept up
> with acquaintances and his family.  His concentration was characterized as overtly
> adequate.  Dr. Richmond diagnosed the clamant with schizoaffective disorder,
> primarily depressed type; a panic disorder with agoraphobia; and, marijuana
> abuse.  He was given a Global Assessment of Functioning of 45-50.  (Ex. 3F).
> According to the Diagnostic and Statistical Manual of Mental Disorders (DSM-
> IV), a GAF of 45-50 indicates the claimant was experiencing serious symptoms or
> has a serious impairment in social, occupational, or school functioning.  I give
> very little weight to this GAF as it is inconsistent with the findings and opinions
> contained in Dr. Richmond's examination report, the findings and opinions
> contained in the claimant's CHCS treatment records, and the claimant's testimony
> regarding his daily activities, all of which suggest he experiences, overall, no
> more than moderate symptoms and limitations due to any mental impairment.[86]

The ALJ did not err by rejecting the GAF score assessed by Dr. Richmond.

In addition, Melugin complains that the ALJ rejected the findings and opinions of Cilla

Stultz.  Ms. Stulz is a licensed psychological associate who examined Melugin on January 23,

---

[84]*See* SSR 96-6p: Policy Interpretation Ruling, Titles II & XVI: Consideration of Admin. Findings of Facts by St. Agency Med. & Psychological Consultants & Other Program Physicians & Psychologists at the ALJ & Appeals Council Levels of Admin. Rev.; Med. Equivalence, Jul. 7, 1996.

[85]*Id*.

[86]SSA record, p. 12.

2008. The ALJ gave little weight to Stultz's findings and opinions.

> The regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker. For example, the opinions of physicians or psychologists who do not have a treatment relationship with the individual are weighed by stricter standards, based to a greater degree on medical evidence, qualifications, and explanations for the opinions, than are required of treating sources.[87]

Stulz did not have a treatment relationship with Melugin. Melugin's advocate sent Melugin to Stultz after the hearing. Stultz's report is largely a personal history as reported by Melugin. In the report, Stulz opined that Melugin's "symptoms are causing a marked impairment of his overall functioning."[88] The following passage from the ALJ's opinion reflects a careful consideration of Stulz's report:

> I considered the findings and opinions contained in Exhibit 20F [Stultz's report]. Exhibit 20F, a psychological evaluation of the claimant conducted subsequent to the hearing at the request of the claimant's counsel, reflects findings (e.g., suicidal ideation and hallucination) and conclusions substantially at odds with the findings and conclusions contained in the claimant's CHCS treatment records (See Ex. 17F discussed at length above) as well as the findings of Dr. Richmond (Ex. 3F) and the opinions of Dr. McDonald (Ex. 5F). It is also inconsistent with the claimant's testimony regarding daily activities which further indicate that his mental impairments are substantially controlled with treatment. Consequently, I gave the findings and opinions of Cilla Stultz, M.S., little weight in determining the claimant's mental residual functional capacity as her opinions, especially the GAF of 45, are not supported by the record as a whole.[89]

My review of the record supports this assessment. The ALJ did not err in giving little weight to Stultz's findings and opinions.

---

[87]SSR 96-6p: Policy Interpretation Ruling, Titles II & XVI: Consideration of Admin. Findings of Facts by St. Agency Med. & Psychological Consultants & Other Program Physicians & Psychologists at the ALJ & Appeals Council Levels of Admin. Rev.; Med. Equivalence, Jul. 7, 1996.

[88]SSA record, p. 402.

[89]*Id*. at p. 14.

Finally, Melugin alleges the ALJ failed to apply the proper step-three legal standard in determining whether his mental impairment meets or medically equals a listed impairment. Melugin maintains that the Fifth Circuit's decision in *Audler v. Astrue*[90] required the ALJ to discuss his step-three analysis in more detail. In *Audler*, the Fifth Circuit determined that an ALJ must do more in a step-three analysis than specify a claimant's impairment and summarily conclude the impairment not severe enough to meet or medically equal a listed impairment.[91] The court explained that "the ALJ [is] required to discuss the evidence offered in support of [the claimant's] claim for disability and to explain why [the claimant is not] disabled at that step."[92] The ALJ is not always required to do an exhaustive point-by-point discussion, but a reviewing court must be able to tell whether the ALJ's decision is based on substantial evidence.[93] The following passage from the ALJ's opinion shows that the ALJ specified the applicable listings and provided an explanation about why Melugin's depression does not meet the listing:

> The criteria of section 12.04 [affective disorders], 12.06 [anxiety related disorders], and 12.09 [substance addiction disorders] are not met. The claimant acknowledges that he is able to perform all of his self-care activities without assistance and that he does household chores including washing dishes, laundry, sweeping, mopping, and preparing simple foods. The record as a whole does not document his alleged difficulties with people. He continues to reside with his ex-wife and children. He reports maintaining social contacts and attending church services on a routine basis. . . . An April 20, 2006 mental status examination showed he was able to spell "horse" forward and backward correctly, that his digit span was 6 forward and 5 backward and that he had no difficulty doing single digit subtraction. His recall was 3/3 after 5 minutes. . . .Mental health treatment

---

[90]501 F.3d 446, 448 (5th Cir. 2007).

[91]*Audler*, 501 F.3d at 448.

[92]*Id.*

[93]*Id.*

records show his memory is intact on examination. There is no evidence he has experienced an episode of decompensation of extended duration during the time at issue. No "C" criteria are met.[94]

Although Melugin complains that the ALJ failed to have a medical expert testify at his hearing, the regulations do not require the ALJ to have a medical expert at a hearing.[95] The regulations require the ALJ to consider the opinion of the Commissioner-designated psychological consultant[96]—here, Dr. McDonald. Dr. McDonald considered the listings in the quoted passage and determined that Melugin's mental impairment does not meet listings 12.04, 12.06 or 12.09.[97] The ALJ did not err in the step-three analysis.

## Recommendation

Because the ALJ made no error of law and because substantial evidence supports the ALJ's determinations, I recommend DENYING Melugin's request for relief (docket entry # 3) and AFFIRMING the Commissioner's decision.

## Instructions for Service and Notice of Right to Object/Appeal

The United States District Clerk shall serve a copy of this report and recommendation on all parties by either (1) electronic transmittal to all parties represented by attorneys registered as a "filing user" with the clerk of court, or (2) by mailing a copy to those not registered by certified

---

[94]SSA record, pp. 10-11.

[95]*See* 20 C.F.R. § 416. 927(f)(2)(iii) ("Administrative law judges *may* also ask for and consider opinions from medical experts on the nature and severity of your impairment(s) and on whether your impairment(s) equals the requirements of any impairment listed in appendix 1 to subpart P of part 404 of this chapter.") (italics added); 20 C.F.R. § 404.1527(f)(2)(iii) (same).

[96]20 C.F.R. § 416.926 (c) ("We also consider the opinion given by one or more medical or psychological consultants designated by the Commissioner.").

[97]SSA record, pp. 179, 181 & 184.

mail, return receipt requested. Written objections to this report and recommendation must be filed within 14 days after being served with a copy of same, unless this time period is modified by the district court.[98] **Such party shall file the objections with the clerk of the court, and serve the objections on all other parties and the magistrate judge.** A party filing objections must specifically identify those findings, conclusions or recommendations to which objections are being made and the basis for such objections; the district court need not consider frivolous, conclusive or general objections. A party's failure to file written objections to the proposed findings, conclusions and recommendations contained in this report shall bar the party from a *de novo* determination by the district court.[99] Additionally, failure to file timely written objections to the proposed findings, conclusions and recommendations contained in this report and recommendation shall bar the aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.[100]

      **SIGNED** on January 7, 2010.

*Nancy Stein Nowak*
NANCY STEIN NOWAK
UNITED STATES MAGISTRATE JUDGE

---

[98] 28 U.S.C. §636(b)(1); FED. R. CIV. P. 72(b).

[99] *Thomas v. Arn*, 474 U.S. 140, 149-152 (1985); *Acuña v. Brown & Root*, 200 F.3d 335, 340 (5th Cir. 2000).

[100] *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996).